UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RUFUS A. THOMPSON, III, | ) | |
| | ) | |
| Petitioner, | ) | No. 3:05-0783 |
| | ) | (Criminal Case |
| v. | ) | No. 3:01-00116) |
| | ) | Judge Echols |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM

Pending before the Court is Petitioner Rufus A. Thompson III's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 (Docket Entry No. 1), to which the Government has responded in opposition (Docket Entry No. 11).

### I. PROCEDURAL HISTORY

On March 20, 2002, a jury convicted Petitioner and his co-Defendant, Gregory Potter ("Potter"), on multiple counts arising from three fire bombings of two residences that occurred in Nashville, Tennessee. A third co-conspirator, William Hunnicutt ("Hunnicutt"), entered a guilty plea and testified against Petitioner and Potter at trial.

The prosecution involved Potter's and Hunnicutt's use of Molotov cocktails to burn two houses in the spring of 2001 at Thompson's direction. The residents of these homes had contacted police repeatedly about Thompson's drug trafficking activity in the neighborhood.

The jury convicted Petitioner of conspiracy to make and possess firearms, in violation of 18 U.S.C. § 371 (Count 1);

1

possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d) (Counts 2, 8, 14); possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g) (Counts 3, 9, 15); aiding and abetting the use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) & 2 (Counts 5, 11, 17); distribution of cocaine base in violation of 21 U.S.C. § 841 (a)(1) (Counts 7, 13, 19); and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 6, 12, 18). On June 17, 2002, the Court sentenced Petitioner to five consecutive terms of life imprisonment plus an additional 30 years, a five-year term of supervised release, restitution in the amount of $147,996.29, and a special assessment of $1,600.00.

On direct appeal, Petitioner challenged his convictions under 26 U.S.C. § 5861(d) on the ground the statute exceeded Congress' taxing authority. He also challenged his felon in possession convictions on the ground that 18 U.S.C. § 922(g) violated the Commerce Clause. Those claims were rejected and Petitioner's convictions were affirmed. United States v. Thompson, 361 F.3d 918 (6th Cir. 2004).

On October 4, 2005, Petitioner filed this § 2255 Motion raising two claims. He asserts counsel was ineffective in failing to object to the unduly prejudicial testimony of three witnesses who Petitioner contends were coerced into testifying. Relatedly he claims counsel erred in failing to raise this argument on appeal.

He also contends he is entitled to resentencing based upon recent Supreme Court decisions.

## II. STANDARD OF REVIEW

To prevail on a § 2255 motion, the Petitioner must establish either an error of constitutional magnitude that had a substantial and injurious effect or influence on his criminal proceeding, see Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), or the record must reflect a fundamental defect in the proceedings that inherently resulted in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure. Reed v. Farley, 512 U.S. 339, 348 (1994); United States v. Todaro, 982 F.2d 1025, 1028 (6th Cir. 1993). Claims of trial error must be raised in the trial court and on direct appeal or such claims are procedurally defaulted. See Phillip v. United States, 229 F.3d 550, 552 (6th Cir. 2000).

To excuse a procedural default, the Petitioner must show cause for failing to raise the claim prior to the filing of his § 2255 Motion and actual prejudice resulting from the error of which he complains, or he must show his actual innocence of the crime. See id.; Peveler v. United States, 269 F.3d 693, 697 (6th Cir. 2001). Absent such a showing, a procedurally defaulted claim cannot give rise to relief under § 2255. Peveler, 269 F.3d at 698.

To establish ineffective assistance of counsel, Petitioner must show that his trial or appellate counsel's performance was deficient and that the deficiency prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Evitts v. Lucey, 469 U.S.

3

387, 396 (1985). Petitioner must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, and that there is a reasonable probability that the lawyer's errors prejudiced the outcome of the proceedings against him. Strickland, 466 U.S. at 687; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). A reasonable probability is one sufficient to undermine confidence in the outcome; it is a less demanding standard than "more likely than not." Id. A court need not address both parts of the Strickland test if the petitioner makes an insufficient showing on one. Strickland, 466 U.S. at 697.

With regard to the direct appeal, Petitioner did not have a constitutional right to have every non-frivolous issue raised, see Jones v. Barnes, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel. United States v. Perry, 908 F.2d 56, 59 (6th Cir. 1990). An attorney is not required to present an argument for which there is no good-faith factual support in order to avoid a charge of ineffective representation. Krist v. Foltz, 804 F.2d 944, 946-47 (6th Cir. 1986). In fact, the process of "'winnowing out weaker arguments on appeal'" is "the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986). Generally, the presumption of effective assistance of counsel is overcome only when the ignored issues are clearly stronger than the ones presented. Monzo v. Edwards, 281 F.3d 568, 579 (6th Cir. 2002).

4

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

Under Rule 8 of the Rules Governing Section 2255 Proceedings, the Court "must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Petitioner is not entitled to an evidentiary hearing if the 2255 motion and the record of the case conclusively show that he is not entitled to relief. See Green v. United States, 65 F.3d 546, 548 (6th Cir. 1995). Finally, "when the trial judge also hears the collateral proceedings, as [is] the case here, that judge may rely on his recollections of the trial in ruling on the collateral attack." Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

### III. ANALYSIS

#### A. Ground One: Ineffective Assistance of Counsel

Petitioner failed to raise this issue on direct appeal. That failure, however, is not fatal:

> As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations[.] Ineffective assistance of counsel claims are therefore typically pursued in a proper post-conviction proceeding under 28 U.S.C. § 2255.

5

United States v. Crowe, 291 F.3d 884, 886 (6th Cir. 2002)(citations omitted).

Turning to the merits, the essence of Petitioner's claim is that three witnesses - Hunnicutt, Jessica Huff ("Huff"), and Jennifer Gilley ("Gilley") were coerced into testifying. Petitioner states:

> If the prosecution's version of events is to be believed, these three witnesses were prostitutes and crack cocaine consumers. Further, it has been held out that they were involved in the instant offense in order to obtain payment in "crack cocaine." Therefore, it is not a stretch of the imagination to believe that these individuals would tell the authorities what ever [sic] they wanted to hear in order to stay out of jail and to be able to smoke more crack and whatnot. A once over review of the videotaped statements demonstrates they were easily swayed to testify in the manner the authorities prompted them and coerced them to do. Of course by the time these witnesses were on the stand, a general version of events had been solidified, prejudicing Petitioner with their coerced and unreliable testimony. This said testimony was obtained in violation of the witnesses' Fifth and Sixth Amendment rights. And consequently, admitting the testimony violated Petitioner's right to a fair trial.

(Docket Entry No. 2 at 8). Petitioner then posits that this Court must determine whether the witnesses were subject to custodial interrogations to determine whether the respective interrogations violated the Fifth or Sixth Amendment. The government's blanket response, without citation to authority, is that "Petitioner seeks to assert the 5th and 6th amendment rights of the **witnesses** [but he] has no standing to assert the 5th and 6th amendment rights of witness [sic] or suppress their testimony." (Docket Entry No. 11 at 3, bolded in original).

6

While there is authority for the proposition that a Defendant may not have standing to assert the Fifth or Sixth Amendment right of a witness, see, e.g., United States v. Peterson, 698 F.2d 921, 924 (8th Cir. 1983), there also is abundant authority for the proposition that a Defendant does have a right to challenge the voluntariness of a witness' confession on due process grounds. See, e.g., Douglas v. Woodford, 316 F.3d 1079, 1092-93 (9th Cir. 2003); Brown v. Jones, 255 F.3d 1273, 1281-82 (11th Cir. 2001); United States v. Iron, 53 F.3d 947, 948-949 (8th Cir. 1995). That is precisely what Petitioner is alleging in this case: his right to a fair trial was violated by Hunnicutt, Gilley and Huff's testimony.

The question of whether a witness' statement is involuntary hinges on whether "the government's conduct caused the witness' will to be overborne and his capacity for self-determination critically impaired." United States v. Dowell, 430 F.3d 1100, 1107 (10th Cir. 2005). Factors to be considered "'include the [witness's] age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether Miranda warnings were given, the accused's physical and mental characteristics, the location of the interrogation, and the conduct of the police officers.'" Id. (citation omitted).

In this case, it can hardly be said that Gilley's or Huff's will was overborne by the conduct of the police.[1] Huff, who has a

---

[1] This Court has reviewed Gilley's and Huff's videotaped interviews.

7

GED, freely gave a statement at the police station during the course of an interview. Present in the room was a Metro police officer and an ATF agent. After receiving her *Miranda* warnings and signing a waiver of rights form, Huff readily agreed to cooperate. She first gave her version of events without interruption and then was asked questions by the police. Throughout the interview, which lasted less than two hours, the law enforcement officers were exceedingly cordial. At no time was she threatened, and the only promise offered by the officers was that they would try to help her in resolving an outstanding criminal citation.

As for Gilley, who has a tenth grade education, she had been picked up on a failure to appear warrant and was much more reluctant to talk to the police. She was interviewed twice during the evening of May 8, 2001, for a total time of approximately two hours and ten minutes. After having her rights read to her and signing a waiver of those rights, she too was allowed to tell her story and was then questioned by the officers. It is clear that she was being coy and less-than-forthcoming about what she knew. Nevertheless, she was never physically threatened and, throughout the interview, the officers involved remained entirely professional. She was informed that if she cooperated, they would try to have her bond reduced on the failure to appear charge. If not, the police would seek to have a high bond set on her outstanding warrant.

8

The interviews of Gilley and Huff are not the type of interviews which are condemned as being coercive. In fact, far more coercive tactics have been found to be constitutional.

For example, in <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1148 (11th Cir. 1987), the petitioner argued that testimony against him had been coerced from two witnesses and that this violated his due process rights rendering his murder trial fundamentally unfair. The witnesses, both of whom were elderly, originally told the police they knew nothing of the murder, but later, after extensive interrogation, then signed statements attesting to their involvement, as well as the petitioner's involvement, in the crime. The trial court held that the "intimidating tactics" violated the petitioner's constitutional rights. However, that determination was reversed on appeal even though transcripts of the interrogation showed the police had "threatened to charge [one of the witnesses] with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation" and the other witness was interrogated for over eight hours without food or water, and was told that he could be sent to the electric chair or would die in prison. <u>Id</u>. Although the police misconduct was found not commendable, the petitioner's due process right to a fundamentally fair trial was not violated because the petitioner had full knowledge of the nature of the two witnesses' interrogation, had access to the tapes and transcripts prior to trial, had an opportunity to use those materials when examining both witnesses, and was able to cross-examine both witnesses.

9

Likewise in this case, counsel for the Petitioner was given copies of the interviews prior to trial and an opportunity to use those materials in examining Huff and Gilley. In fact, defense counsel made clear through their questioning that Gilley did not want to be interviewed, but only wanted to post her bond and go home. The jury also learned that Gilley was told during the interview that she was in "deep trouble" and that there would be a correlation between her cooperation in the interview and the amount of her bond. (Trial Transcript at 443-444). The jury also learned of Huff's earlier interview through cross-examination and that the police had offered to help her with her outstanding citation. (Id. at 393).

Moreover, both Gilley and Huff were very effectively cross-examined, such that the jury could hardly be left with the impression that either was a model citizen. During her testimony Huff admitted to numerous prior felony convictions for crimes ranging from forgery, to obtaining drugs by fraud, to the sale of drugs, for which she spent five years in prison. (Id. at 341, 383). She also admitted that she was a prostitute, crack addict, abuser of prescription drugs and alcoholic. (Id. at 341-342, 371-373). Huff further testified that she was "pretty drugged up" at the time of the crimes at issue and had been awake for two or three consecutive days. (Id. at 378-379).

The jury was fully informed that Gilley had a similar troubled past. She admitted that she had been convicted of possessing a hand grenade and aggravated assault, and that she had been placed

10

on probation and violated that probation. (Id. 425, 429-430). Gilley also testified that she was a prostitute, a prescription drug abuser, an alcoholic, and a crack addict with a three-to-four hundred dollar a day habit. She admitted that drugs affected her ability to recall events correctly and that, at the time of the crimes in issue, she had been up for several consecutive days during which she smoked crack and consumed beer.

There simply is no basis in the record for concluding that Petitioner's right to due process was violated because of the testimony of Gilley and Huff. Likewise, Petitioner was not deprived of his right to a fair trial because of the testimony of Hunnicutt.

Hunnicutt was intimately involved in the crimes at issue. Hunnicutt testified that he and Potter agreed with Petitioner to burn two houses at Petitioner's request in exchange for payment in the form of crack cocaine. Hunnicutt described the steps taken to utilize Molotov cocktails to burn the houses, and Petitioner's payments in crack cocaine. (Id. at 254-269).

Because of his involvement in the crimes, Hunnicutt was charged in a one-count Indictment with possession of a Molotov cocktail for which he could receive up to a ten-year sentence. He entered into a Plea Agreement ("Agreement") which calculated his Guideline Sentencing range to be between 46 to 57 months. (Case No. 3:01-00091). Under the Agreement, the Government agreed to recommend a three-level reduction for Hunnicutt's acceptance of

11

responsibility and Hunnicutt agreed to testify truthfully before the grand jury and at any subsequent trial.

The fact that Hunnicutt entered into an agreement with the government does not make his testimony inherently unreliable. "'No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." United States v. Ware, 161 F.3d 414, 421 (6th Cir. 1998) (quoting United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987)). The jury was fully informed of the nature and substance of the Agreement, and it was made clear to them that Hunnicutt received what may properly be labeled a "sweetheart deal" (Trial Transcript at 304-315). Hunnicutt's Agreement was not so favorable[2] that it created a high risk Hunnicutt would perjure himself and thereby deprive Petitioner of his due process right to a fair trial. See, United States v. Irons, 53 F.3d 847, 948 (8th Cir. 1995)(collecting cases indicating defendant's due process rights are not violated where co-defendant testifies pursuant to an agreement which provides co-defendant will receive favors if he testifies truthfully and the jury is informed of the substance of the plea agreement).

Moreover, Hunnicutt's veracity was thoroughly explored during cross-examination. Hunnicutt admitted that until he "found God"

---

[2]As it turned out, Hunnicutt was sentenced to prison for 46 months.

12

while in jail seven months before trial, he was a liar and a thief. (Trial Transcript at 275). He also admitted he absconded after his mother had posted a bond, and had served time in jail for theft. (Id. at 276, 289). Additionally, Hunnicutt admitted that he stole Gilley's car shortly after the fire bombings so he could flee to Indiana. (Id. at 297).

Hunnicutt further admitted that at the time of the events in question he was addicted to crack cocaine which he paid for from the money he received from the five or six prostitutes he had on the streets working. (Id. at 277). In fact, he admitted that at the time of the incidents, he had been up for four or five consecutive days and repeatedly smoked crack during this time. (Id. at 291). He further stated that even though he did not like the taste of alcohol, when he drank, he "drank to get drunk." (Id. at 278).

Additionally, the jury was informed that upon being arrested, Petitioner gave a statement to ATF agents in Merrillville, Indiana. He provided what he admitted was a "self serving" statement[3] absolving himself of any responsibility, except as to carrying the Molotov cocktails to the scene, whereas at trial he admitted actually participating in making Molotov cocktails and throwing a

---

[3] Unlike the video-taped statements of Huff and Gilley, Hunnicutt's statement was not made a part of the record in the underlying criminal case. Nevertheless, it is clear that the jury was presented with sufficient evidence of Hunnicutt's potential bias and motive to make its credibility determination and was fully informed that Hunnicutt's statement was different than his trial testimony. Hunnicutt tried to point the finger at others in his statement and the jury was fully informed of that fact.

13

fire bomb. He also indicated in his statement that he did not know who was providing the cocaine as payment for the fire bombings, whereas, at trial he identified Petitioner as being the one who was paying for the fire bombings. (Id. 288-289). Clearly, Hunnicutt's prior inconsistent statements were made known to the jury and could be used by the jury in making its credibility determination.

Because Defendant's due process rights were not violated as a result of the testimony of Gilley, Huff, and Hunnicutt, his counsel was not ineffective in failing to object to their testimony at trial[4] or preserve the issue for appeal. Accordingly, he is not entitled to relief under 28 U.S.C. § 2255 on this ground.

**B. Ground Two: Sentencing**

Petitioner contends his sentence violates the Fifth, Sixth, and Fourteenth Amendments in light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) which expanded upon the holdings in Blakely v. Washington, 542 U.S. 296 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000). In Booker, the Supreme Court held the Constitution requires that any fact which increases a federal defendant's sentence beyond the maximum

---

[4] Counsel did in fact file a Motion for Pretrial Determination for Admissibility of Co-Conspirators' Statements (Case No. 3:01-0116, Docket Entry No. 57) seeking to preclude hearsay statements. That motion was denied by Order of this Court (Docket Entry No. 86). However, in doing so, the Court noted that it would be incumbent upon the government to prove that such statements were admissible. The government did so by proving the existence of a conspiracy and statements made in furtherance of that conspiracy. See, United States v. Payne, 2006 WL 318612 at *3-4 (6th Cir. 2006)(where independent corroborated evidence of a conspiracy exists, statements made in furtherance of the conspiracy are admissible under Fed. R. Evid. 801(d)(2)(E)).

14

sentence authorized by the facts established by a plea or a jury verdict must be admitted by the defendant or proven to a jury beyond a reasonable doubt.

Petitioner's contention that his sentencing violated the Constitution in light of the three recent pronouncements of the Supreme Court must be rejected. The Sixth Circuit has expressly held that Booker, Blakely, and Apprendi do not apply retroactively to cases final on direct review, or to cases on collateral review. Humphress v. United States, 398 F.3d 855, 857 (6th Cir. 2005)(Booker which expanded Blakely to the federal sentencing scheme, is not retroactive); Goode v. United States, 305 F.3d 378, 382 (6th Cir. 2002)(Apprendi is not applicable to collateral review under Section 2255).

Recognizing that Booker is not retroactive, Petitioner claims he nevertheless can obtain the benefit of that decision under 28 U.S.C. § 2255 para. 6(3) which provides that the one year statute of limitations for filing a § 2255 motion shall begin to run on "(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." However, even though Booker established a new rule, it has not been made retroactively applicable to cases on collateral review and therefore 28 U.S.C. § 2255 para. 6(3) is inapplicable. See, Hicks v. United States, 146 Fed. Appx. 396, 397 (11th Cir. 2005); United States v. Brower, 2005 WL 2644969 at *2 (10th Cir. 2005). Accordingly, Petitioner is

15

not entitled to resentencing in light of the fact that Booker deemed the Sentencing Guidelines advisory.

## IV. CONCLUSION

For all of the reasons stated, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Docket Entry No. 1) will be DENIED.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

16